Barbara T. Wells, Esq., wellsb@sec.gov
Richard M. Bayus II, Esq., bayusr@sec.gov
Attorneys for Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
(303) 844-1000

Daniel J. Wadley, Esq., wadleyd@sec.gov, Bar. No. 10358
Attorney for Securities and Exchange Commission
15 W. South Temple Street
Suite 1800
Salt Lake City, UT 84101
(801) 524-3422
(Local Counsel)

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| | : Case No.:2:11CV 0275 |
| MIKE WATSON CAPITAL, LLC , MICHAEL P. WATSON, and JOSHUA F. ESCOBEDO, | :  Judge Dee Benson |
| Defendants | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission")

alleges as follows:

## I.      SUMMARY OF THE ACTION

1.      From approximately October 2004 through at least February 2009, Mike

Watson Capital, LLC ("MWC"), through its principal Michael P. Watson ("Watson") and

its chief capital officer Joshua F. Escobedo ("Escobedo") (collectively referred to as the "Defendants"), raised more than $27.5 million from over 120 investors nationwide through a fraudulent and unregistered offering of promissory note securities issued by MWC.

2.     The Defendants solicited MWC promissory note investors primarily through nationwide real estate investment education seminars conducted by Watson's company, Mike Watson Investments, LLC ("MWI").  At MWI seminars, Watson portrayed himself as a highly successful real estate investor and developer, with proven investment strategies being carried out by MWC.

3.     The Defendants represented that MWC paid annual returns of 8% to 20% by pooling investor funds for real estate acquisitions and developments.  They further assured investors that their funds were safe due to, among other things, MWC's sizeable real estate equity, positive cash flow from operations, and successful track record.

4.     In reality, MWC essentially operated as a Ponzi scheme.  During the entirety of its promissory note offering, MWC did not generate sufficient income from its real estate investments to fund investor returns or redemptions.   Instead, unknown to investors, MWC paid investor returns and redemptions by using new investors' funds, and loans from Watson or various other entities that he controlled.  The Defendants also misled investors as to MWC's financial condition, past performance, and the safety of the MWC promissory notes.

5.     Through these actions, MWC, Watson, and Escobedo violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder.

6.      In addition to the securities fraud violations, the promissory notes offered and sold through MWC were securities which were not registered with the Commission at the time they were offered and sold to investors as required, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

7.      Finally, Watson and Escobedo acted as unregistered broker-dealers in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] in the course of offering and selling the promissory notes.

## II.      JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to authority conferred on it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to restrain and enjoin the Defendants from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.  The Commission seeks permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, and third-tier penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)].

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  The Defendants, directly or indirectly, made use of the means and

instrumentalities of interstate commerce or of the mails, in connection with the acts, practices, and courses of business alleged in this Complaint.

10.     Venue lies in this Court pursuant to 15 U.S.C. §§ 77u(a) and 78aa and 28 U.S.C. § 1391(b)(2).  Defendant MWC is a Utah limited liability company and maintains its principal place of business in Provo, Utah.  Defendant Watson resides in Mapleton, Utah, and defendant Escobedo resides in Spanish Fork, Utah.  In addition, many of the acts and practices described in this Complaint occurred in the District of Utah.

### III.     DEFENDANTS

11.     **Mike Watson Capital, LLC (MWC)** is a Utah limited liability company with its principal place of business in Provo, Utah.  MWC issued promissory notes to more than 120 investors in at least 21 states, for the stated purpose of pooling investor funds to acquire and improve real estate.  Michael P. Watson is MWC's sole owner and managing member.  MWC has not registered any securities offerings with the SEC.

12.     **Michael P. Watson,** age 41, is a resident of Mapleton, Utah and the founder and sole owner and managing member of MWC and MWI.  Watson does not hold any securities licenses, and he has never been associated with a registered broker-dealer.  Prior to founding MWC, Watson was a real estate agent, real estate investor and lecturer on real estate investing.

13.     **Joshua F. Escobedo**, age 36, is a resident of Spanish Fork, Utah. Escobedo has worked for Watson, MWC and other Watson controlled-entities in various capacities since 2003.  Escobedo was in charge of raising capital from investors for MWC, including selling promissory notes, since at least May 2007.  Escobedo does not

hold any securities licenses, and he has never been associated with a registered broker-dealer.

## IV.     RELATED PARTY

14.     **Mike Watson Investments, LLC (MWI)**, is a Utah limited liability company with its principal place of business in Provo, Utah.  MWI was formed to conduct educational seminars regarding real estate investments and to sell related educational materials.  From approximately 2005 through 2009, MWI loaned approximately $1.2 million to MWC to fund various obligations.

## V.     FACTS

### A.     MWI Investment Seminars

15.     In approximately October 2004, Watson formed MWI for the purpose of conducting nationwide real estate investment seminars.  Watson's stated investment strategies included improving and reselling distressed properties, converting apartments to condominiums, flipping properties, and improving and then reselling vacant land.

16.     MWI seminars often targeted realtors, but they were advertised in local media and were open to the general public.  MWI offered a variety of programs, including free introductory seminars, as well as paid instruction lasting anywhere from one afternoon to multi-day "boot camps."  In 2008 and early 2009, MWI also offered free seminars on the Internet.

### B.     MWC's Promissory Note Offering

17.     Watson reviewed and approved the MWC offering materials provided to prospective investors.  These materials included, among other things, a prospectus, promotional literature entitled "Advantages to Investing with Mike Watson Capital,

LLC," and a form promissory note.  Escobedo reviewed the MWC offering materials before disseminating them to investors.

18.     Watson and Escobedo used MWI seminars as a forum to solicit promissory note investments in MWC.  During seminars, Watson described various MWC projects as part of his substantive presentation and to illustrate lesson points. While discussing MWC, Watson made claims regarding, among other things, the value of the company's real estate assets, MWC's equity in those assets, and the positive cash flow and profits they generated for MWC.

19.     Watson and Escobedo each directly solicited investments in the MWC notes at the seminars and on other occasions when talking with students, emphasizing the notes as a way for students to profit from Watson's investing techniques and expertise.

20.     Escobedo and/or his assistant provided prospective investors with the MWC offering materials, in person at seminars, or by mail and email.  Escobedo also solicited promissory note investments from prospective seminar attendees and from referrals provided by current investors.

21.     The MWC prospectus described MWC's general investment strategy and listed thirty-six properties purportedly owned by MWC, including seventeen multi-family properties, with eighty-one units.  Although the prospectus did not include a traditional financial statement, it listed, among other things, the total value of all property that MWC purportedly owned, MWC's equity in the property, and annual cash flow generated by the property.  The prospectus also represented that "[t]he financial statements of [MWC] and its subsidiaries are prepared in conformity with accounting principles generally accepted in the United States."

22.     MWC issued promissory notes in amounts ranging from $2,500 to $450,000.  The notes varied in duration, but most had a one year term.  Many contained a provision allowing for premature redemption, without penalty, upon provision of specified notice.

23.     The promissory notes featured returns in the form of points paid at note maturity and/or annual interest rates ranging from 8% to 20%, paid either in monthly installments or at maturity.  MWC offered different interest rates to promissory note investors based upon the size of the investment amount.  Investors who provided successful referrals for additional note sales were also offered increased returns on their existing notes.

24.     Investors that purchased promissory notes of $100,000 or greater were told that they could receive, upon request, collateral in the form of a deed of trust on MWC property.

25.     When promissory notes came due, Watson and Escobedo encouraged investors to roll-over their investment with MWC for another term at a negotiated rate.

26.     MWC made only cursory attempts to determine if MWC's investors were accredited and many were not.  Although MWC included a "sophisticated investor questionnaire" and an accredited investor worksheet with its offering materials, some investors did not complete the forms until after investing, while others never completed them at all.  Some investors advised MWC that they were unaccredited and were told they could still purchase promissory notes.

27.     MWC did not register its promissory note offering with the SEC or any state securities authority.  From approximately October 2004 through February 2009,

under the supervision of Watson and Escobedo, MWC raised more than $27.5 million

dollars from more than 120 investors nationwide.

**C.      MWC's Promissory Note Offering Was Fraudulent**

28.      In MWC's prospectus, and at dozens of seminars, the Defendants

represented that MWC used investors' funds for real estate acquisitions and

improvements, and that it paid promissory note returns from the tremendous profitability

and cash flow of its real estate investment business.  For example, the prospectus stated:

"[MWC] invests in real estate and real estate related investments . . . [t]he value of

[MWC], and the security of your investment in this Offering, depends mainly of the value

of [MWC's] real estate investments, and the income generated by those investments . . .

"[MWC seeks] short and long term returns through improvements to and appreciation of

real estate."  However, the Defendants knew or were reckless in not knowing that these

representations were false because, although MWC used some investors' funds to acquire

and improve real estate, MWC's operations never generated sufficient income to meet its

monthly interest or redemption obligations to promissory note holders.

29.      Instead, in classic Ponzi-like fashion, MWC compensated for its cash

shortfalls by continuing to raise new cash through the issuance of new promissory notes

to investors.  The Defendants then used investors' funds to make interest and redemption

payments to previous investors.  When new investors' funds were not sufficient to meet

these obligations, Watson also provided loans from personal funds or from other Watson-

controlled entities.  As MWC raised more funds and its monthly interest expense on the

notes grew, MWC used fewer and fewer investors' funds to purchase or to improve real

estate.  None of these activities were disclosed to investors.

30.     MWC made its last real estate acquisition in March 2008.  However, the Defendants continued selling promissory notes through at least February 2009.  Capital raised during this period was used almost entirely to pay previous investors.

31.     The Defendants also misled investors regarding the extent of MWC's assets.  Although MWC's prospectus claimed that it had real estate equity of more than $3.7 million, this amount was greatly overstated because it failed to account for the millions in debt owed to promissory note holders and to private mortgage lenders.  Furthermore, the property referenced in the prospectus was not owned by MWC, but instead was held by Watson personally or by other Watson-affiliated entities.

32.     The Defendants also repeatedly misrepresented that MWC had significant, positive cash flow from its real estate investments.  MWC's prospectus claimed that all of MWC's properties combined delivered positive cash flow of $13,000 annually.  In seminars with prospective investors, Watson and Escobedo further claimed that MWC's properties generated positive *monthly* cash flow of tens or even hundreds of thousands of dollars.  The Defendants knew or were reckless in not knowing that these representations were false because MWC's properties never delivered sufficient cash flow to pay operating expenses, redemptions, and the monthly interest due to MWC promissory note holders.

33.     In reality, Watson and Escobedo conferred throughout each month to determine whether MWC's incoming cash flow, which primarily came from new sales of promissory notes, was sufficient to meet outgoing cash flow obligations for note redemptions, monthly note interest, business expenses, and commercial mortgages.  The Defendants knew that, in many months when incoming investor funds were not sufficient

34.     The misstatements in the prospectus regarding MWC's assets and cash flow only became more pronounced over time because the prospectus continued to use asset and cash flow numbers from September 30, 2006, without update or supplementation, through the conclusion of the promissory notes offering in February 2009.

35.     The Defendants also made numerous misleading claims to investors regarding MWC's past performance.  For example, the MWC offering materials claimed that Watson had "never lost an investment dollar and has done well over 1,000 closings." This representation remained on MWC's Internet website and in the offering materials until at least July 2008.  However, by at least by October 2007 when Watson sold a MWC property in Arizona and had to supplement the sale proceeds with MWI's funds to prevent a loss to investors, the claim to have "never lost an investment dollar" was demonstrably false.  In addition, the offering materials did not disclose that almost all of the "over 1,000 closings" took place during the course of Watson's prior work as a real estate broker, not as a real estate investor.

36.     The Defendants also made misrepresentations regarding the safety of investing in MWC.  For example, through February 2009, Watson and Escobedo told investors of $100,000 or more that, upon request, their promissory note investment would be secured with a deed of trust on a MWC property.  However, in several instances beginning at least by May of 2008, The Defendants knew that Watson had refused to sign

the paperwork necessary to convey the promised deeds after investors purchased promissory notes.

**D.      MWC's Collapse**

37.      As alleged above in paragraphs 28 through 35, MWC failed to generate sufficient income or returns from its real estate investments to meet its outgoing cash obligations during the time period relevant to the Complaint.  As early as May 2008, Watson became unwilling or unable to draw sufficient funds from his personal assets or other business ventures to meet MWC's outgoing cash needs.  From May 2008 through February 2009, MWC generally refused early redemption requests, and attempted to convince investors with maturing notes to roll-over their investments, including any unpaid returns, for new promissory note terms.

38.      In approximately February 2009, Watson first disclosed in a webinar with selected investors that MWC was unable to meet its monthly interest obligations, to redeem maturing promissory notes, or to continue making payments on commercial mortgages.  In this presentation, Watson blamed MWC's insolvency on the downturn in the national real estate market and admitted for the first time that he had helped prop up MWC with loans from affiliated entities and his personal funds.  Although Watson claimed in the February 2009 webinar that MWC was immediately ceasing its promissory note offering, it appears that MWC accepted funds from at least two additional investors in late February and/or early March 2009.

39.      MWC currently owes more than $19 million in unpaid principal and interest on its promissory notes to investors and has ceased making any payments to its investors.

40.     Since MWC's initial disclosure of its insolvency, the condition of the real estate portfolio held by MWC and/or other entities controlled by Watson has continued to deteriorate.  Commercial banks have foreclosed on at least nine of the properties, and foreclosure is pending on several other MWC properties.  Although MWC and/or other entities controlled by Watson continue to collect rent on some of its properties, these funds have been insufficient to pay property taxes and obligations on other properties, resulting in additional encumbrances.

**E.     MWC's Promissory Notes Offering Was Not Registered With the SEC or Exempt From Registration**

41.     The definition of a "security" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act includes "any note, stock . . . participation in any profit-sharing agreement [or] . . . investment contract."

42.     The  MWC promissory notes were securities under the Securities Act and the Exchange Act.  The MWC promissory notes were "notes" and/or "investment contracts" as defined by Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  The MWC promissory notes were investment contracts because investors made an investment of money, in a common enterprise, with an expectation of profits to be derived solely from the efforts of the promoter or a third party.

43.     From approximately October 2004 through at least February 2009, MWC's promissory notes offering raised approximately $27.5 million from more than 120 investors in multiple states.

44.     MWC's promissory note offering has never been registered with the SEC.

45.     Individual investors sent money to MWC either by wiring funds to designated bank accounts or writing checks to MWC with the expectation of sharing in the net profits from the MWC real estate business activities.

46.     Investors expected the profits to come solely from MWC's real estate operations and investments.  The investors were not required or expected to do anything besides provide funds in order to receive their returns.

47.     The Defendants offered and sold securities in the form of MWC promissory notes to investors using the means or instruments of interstate commerce including but not limited to telephones, the Internet, and the mails.

48.     No registration statement was in effect and no registration statement was filed with the SEC for the offers and sales of any MWC securities.

**F.      Defendants Watson and Escobedo Acted As Unregistered Brokers**

49.     Section 3(a)(4) of the Exchange Act defines a "broker" as any person who is engaged in the business of effecting transactions in securities for the account of others. Section 3(a)(5) of the Exchange Act defines a "dealer" as any person engaged in the business of buying and selling securities for the person's own account through a broker or otherwise.  Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from using jurisdictional means such as the telephone or mails to effect transactions in securities unless the broker or dealer is registered with the SEC.

50.     Watson and Escobedo used the telephone and the mails to effect purchases and sales of MWC securities for the accounts of the investors.  Watson and Escobedo were not affiliated with a broker-dealer registered with the SEC during the time in which they sold MWC securities to investors.

51.     Watson and Escobedo actively solicited investors to purchase securities in seminars, telephone calls, and/or conversations with investors, as well as other means.

52.     Watson and Escobedo participated in MWC securities transactions at key points in the chain of distribution, by, among other things, personally soliciting investors to purchase MWC promissory notes, creating promissory notes distributed to investors, and receiving investors' funds.  Watson was further involved in negotiations between MWC and investors because, among other things, he determined the interest rates for the promissory notes and was responsible for preparation of the MWC written offering materials.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Violations of Securities Act Section 17(a) [15 U.S.C. §§ 77q(a)]**

53.     Paragraphs 1 through 52 are re-alleged and incorporated by reference.

54.     By engaging in the conduct described above, defendants MWC, Watson, and Escobedo have, directly or indirectly, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme or artifice to defraud with scienter; negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or negligently engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

55.     By reason of the foregoing, defendants MWC, Watson, and Escobedo violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## SECOND CLAIM FOR RELIEF

**Fraud in the Purchase or Sale of Securities**
**Violation of Exchange Act Section 10(b) and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

56.     Paragraphs 1 through 52 are re-alleged and incorporated by reference.

57.     By engaging in the conduct described above, defendants MWC, Watson, and Escobedo have, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce or by use of the mails, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

58.     By reason of the foregoing, defendants MWC, Watson, and Escobedo violated, and unless enjoined, will continue to violate, Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Sale of Unregistered Securities**
**Violations of Securities Act Sections 5(a) and (c)**
**[15 U.S.C. §§ 77e(a), 77e(c)]**

59.     Paragraphs 1 through 52 are re-alleged and incorporated by reference.

60.     By engaging in the conduct described above, defendants MWC, Watson, and Escobedo have directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

61.     No valid registration statement was filed or in effect with the SEC and no exemption from registration existed with respect to the securities and transactions described in this Complaint.

62.     By reason of the foregoing, defendants MWC, Watson, and Escobedo violated, and unless enjoined, will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## FOURTH CLAIM FOR RELIEF

### Acting As Unregistered Broker-dealers
### Violations of Exchange Act 15(a)(1) [15 U.S.C. § 78o(a)(1)]

63.     Paragraphs 1 through 52 are re-alleged and incorporated by reference.

64.     Defendants Watson and Escobedo made use of the mails or means or instrumentalities of interstate commerce to effect transactions in or to induce or attempt to induce the purchase or sale of a security without being registered in accordance with Section 15(b) of the Exchange Act.

65.     By engaging in the conduct described above, defendants Watson and Escobedo violated Section 15(a)(1) of the Exchange Act by acting as unregistered broker-dealers in connection with their offer and sale of securities as described in this Complaint.

66.     By reason of the foregoing, defendants Watson and Escobedo violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### A.

Find that the Defendants committed the violations alleged.

### B.

Enter an Order of Permanent Injunction as to the Defendants, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining them from further violations of the provisions of law and rules alleged against them in this Complaint.

### C.

Enter an Order directing the Defendants to disgorge and pay over, as the Court may direct, all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment interest thereon.

### D.

Enter an Order requiring all s to pay third-tier civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

**E.**

Grant such further equitable relief as this Court deems appropriate and necessary.

DATED:  March 23, 2011

Respectfully submitted,

/s/ Daniel J. Wadley
Daniel J. Wadley, Bar No. 10358
Securities and Exchange Commission
15 W. South Temple Street
Suite 1800
Salt Lake City, UT 84101

Barbara T. Wells, Esq.
Richard M. Bayus II, Esq.
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202